JODI LINKER
Federal Public Defender
Northern District of California
JOHN PAUL REICHMUTH
Assistant Federal Public Defender
ANAIS CARELL
Fellowship Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:  (510) 637-3500
Facsimile:  (510) 637-3507
Email:      John_Reichmuth@fd.org
Email:      Anais_Carell@fd.org

Counsel for Defendant Miralda-Cruz

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 24–593 JST |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | Court:         Courtroom 6, 2nd Floor |
| ELDIN JAHIR MIRALDA-CRUZ, | Hearing Date:  August 15, 2025 |
| Defendant. | Hearing Time:  9:30 a.m. |

## INTRODUCTION

Eldin Jahir Miralda-Cruz is an adolescent with a middle-school education, who grew up in extreme poverty in Honduras and who traveled alone to the United States to learn English and attend school. *See* Dkt. 28 ["PSR"] ¶¶ 41-42, 44, 48, 54. After spending a few months enrolled at International High School in Oakland, he began working at a warehouse and in construction to send money to his family, including his sick grandmother, in Honduras. *See id.* ¶¶ 54-55. Struggling to make ends meet and find work, he searched desperately for other ways to earn money. *Id.* ¶ 55. At only sixteen years old and with no prior criminal convictions, he made a terrible decision to become

involved in the drug trade. *See id.* ¶¶ 6, 33-34.

Mr. Miralda-Cruz is now before this Court, having accepted responsibility for his offense. *See id.* ¶ 20. He knows that his decision to sell drugs was "wrong" and "terrible," and he feels immense regret that people took the drugs he distributed, because he knows they are "dangerous." *See id.* Now eighteen, Mr. Miralda-Cruz will likely spend his first formative years of adulthood in custody, in a foreign country, before he is almost certainly deported to Honduras. There, he will work on his family's farm and, as he puts it, will "do things the right way." *Id.* ¶ 56.

Mr. Miralda-Cruz faces an advisory guidelines range of 70 to 87 months in custody. *Id.* ¶ 61. He hopes that the Court will consider the background information detailed in the PSR, as well as the facts presented herein, to impose the 48-month sentence recommended by the Probation Office, the government, and the defense. A four-year sentence is sufficient to achieve the goals of sentencing: It reflects the seriousness of Mr. Miralda-Cruz's offense, while accounting for his youth, difficult upbringing, and the significant collateral consequences he will face because of this conviction.

## ARGUMENT

Mr. Miralda-Cruz did not come to the United States as a teenager intending to sell drugs. He crossed the border, alone, with hopes of learning English, enrolling in school, and working to send money to his family. *See id.* ¶ 42. He left behind him extreme poverty, gang violence, and years of working in manual labor. *Id.* ¶¶ 44-46. But Mr. Miralda-Cruz quickly learned that life in the United States was not what he had imagined. After dropping out of school to work, struggling to make ends meet, and learning that his grandmother had cancer, he turned to selling drugs. *See id.* ¶¶ 48, 54-55.

As the Court is aware, the advisory sentencing range, the nature and circumstances of the offense, and Mr. Miralda-Cruz's history and characteristics are all factors the Court must consider at sentencing. 18 U.S.C. § 3553(a)(1)-(6). The statutory principles and relevant Section 3553(a) factors, addressed below, support the parties' request for a 48-month sentence.

### I. Mr. Miralda-Cruz grew up amidst extreme poverty and violence in Honduras, which weighs in favor of a downward variance

In Honduras, Mr. Miralda-Cruz was forced to grow up quickly. He was born and raised in Tegucigalpa, in the country's Francisco Morazán department. PSR ¶ 41. Mr. Miralda-Cruz was raised

SENTENCING MEMORANDUM
*MIRALDA-CRUZ*, CR 24–593 JST

primarily by his mother and grandmother because his father, an agricultural worker, was employed in a different city. *Id.* ¶ 42.

Honduras is one of the poorest countries in Latin America: six in ten people live in poverty and, in 2019, about half of the country lived off of $6.85 per day.[1] In 2022, when compared with other countries in Latin America, Honduras had the highest share of its population living on less than $3.20 per day.[2] In the Francisco Morazán department, where Mr. Miralda-Cruz grew up, many families live in extreme poverty.[3] The Miralda-Cruz family was no exception. Though Mr. Miralda-Cruz rarely went hungry, because his grandfather grew beans and corn, few other resources were readily available. PSR ¶ 45. Each family member owned only one outfit. *Id.* ¶ 44. The family had little access to medical care, as clinics and hospitals were too expensive, so Mr. Miralda-Cruz's grandmother used plant and herbal remedies when Mr. Miralda-Cruz was sick. *Id.*

Tegucigalpa, like other urban areas in Honduras, suffers from widespread gang violence.[4] Throughout his childhood, Mr. Miralda-Cruz avoided leaving his house out of fear that he would be hurt or killed by gang members. *See* PSR ¶ 46. His grandmother, who owned a grocery store, paid the gangs "rent," or bribes, to keep the family safe. *Id.* Like hundreds of thousands of other Hondurans who have been internally displaced by crime and violence,[5] the Miralda-Cruz family eventually left Tegucigalpa for the smaller, rural town of El Porvenir, where they thought they would find safety. PSR ¶ 46.

But life in El Porvenir was not easy. Gangs were also active in the town, stealing cell phones and extorting money from local business owners. *Id.* ¶ 47. In 2015, gang members murdered Mr. Miralda-Cruz's cousins in a drive-by shooting. *Id.* Mr. Miralda-Cruz was devastated, as he was very close to the cousins who were killed. *Id.* In addition, El Porvenir, like many other rural areas in

---

[1] World Bank Group, *Honduras Poverty Assessment: Toward a Path of Poverty Reduction and Inclusive Growth*, February 2023, at 1, available at https://openknowledge.worldbank.org/server/api/core/bitstreams/d2e8818d-d44f-4721-ac5f-289698a29504/content.
[2] *See Share of population living on less than 3.20 US dollars per day in Latin America in 2022*, available at https://www.statista.com/statistics/1287649/poverty-rate-latin-america/.
[3] World Bank Group, *supra* note 1, at 3.
[4] Human Rights Watch, *Honduras: Events of 2021*, available at https://www.hrw.org/world-report/2022/country-chapters/honduras.
[5] Human Rights Watch, *supra* note 4.

SENTENCING MEMORANDUM
*MIRALDA-CRUZ*, CR 24–593 JST

3

Honduras, lacked access to basic services like electricity, water, and sanitation.[6] The Miralda-Cruz family lived in a small, two-room adobe home that Mr. Miralda-Cruz's father built by hand. PSR ¶ 46. They used an outdoor bathroom and oil lamps for light. *Id.* Because they had no access to running water, the family retrieved water from a nearby river to cook, clean, and drink. *See id.*

Against this backdrop of poverty and violence, Mr. Miralda-Cruz tried to attend school. He stayed in class through the sixth grade, but he could not avoid the pressure to work and earn money for his family. *See id.* ¶¶ 45, 54. Towards the end of his schooling, Mr. Miralda-Cruz began to work in construction, leaving class each day at noon to do strenuous, manual labor until the evening. *Id.* ¶ 45. He mixed and transported cement materials for masons. *Id.* At the time, he was only thirteen or fourteen years old. *Id.* Mr. Miralda-Cruz eventually left school entirely to labor full-time, continuing to work in construction until he left for the United States as a teenager. *Id.* ¶¶ 54-55.

Mr. Miralda-Cruz believed that life in the United States would allow him to pursue his education, learn English, and earn enough money to support his family. *Id.* ¶ 42. When he first arrived in the Bay Area, he set his plans in motion. He enrolled himself at International High School in Oakland and completed a portion of the 11th grade. *See id.* ¶ 54. He worked at a warehouse in Hayward, where he earned only $600 per week packaging items. *Id.* ¶ 55. Eventually, he left the warehouse to work in construction with his cousin, but he struggled to find projects. *Id.* He started drinking weekly and smoking marijuana daily. *Id.* ¶ 53. With little income coming in, he learned that his grandmother in Honduras had been diagnosed with cancer and needed help to pay for her treatment. *See id.* ¶¶ 20, 48. Only sixteen years old and struggling to find money, he turned to selling drugs. *See id.* ¶¶ 6, 20. It was a terrible decision that Mr. Miralda-Cruz regrets immensely—he knows now that there was no excuse for the choice he made. *Id.* ¶ 20.

Given Mr. Miralda-Cruz's childhood of extreme poverty, exposure to gang violence, and family circumstances, a downward variance is warranted.

## II. Mr. Miralda-Cruz's youth and lack of criminal convictions support a below-guidelines sentence

Mr. Miralda-Cruz began his involvement in the instant offense when he was approximately

---

[6] World Bank Group, *supra* note 1 at 2.

SENTENCING MEMORANDUM
*MIRALDA-CRUZ*, CR 24–593 JST

sixteen years old. *See id.* ¶¶ 6, 41. Much of the offense conduct occurred while he was a juvenile. *See id.* ¶¶ 6-16, 41. Courts have long recognized that, for the purposes of sentencing, "children are different." *Miller v. Alabama*, 567 U.S. 460, 481 (2012). "Because juveniles have diminished culpability and greater prospects for reform, . . . 'they are less deserving of the most severe punishments.'" *Id.* at 471 (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)). The Supreme Court has identified three "significant gaps between juveniles and adults": first, "children have a 'lack of maturity and an underdeveloped sense of responsibility'"; second, "children 'are more vulnerable . . . to negative influences and outside pressures'"; and finally, "a child's character is not as 'well formed' as an adult's." *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005)).

Mr. Miralda-Cruz is no different. He made a terrible, harmful choice as a juvenile—one that would involve him in the drug trade. And though youth is no excuse for his actions, he made the choice under immense pressure to provide money for his family and ailing grandmother, with few viable options for employment, while living in a foreign country, and while engaging in daily substance use. He had no criminal convictions, juvenile or otherwise, when he began his involvement in the instant offense. PSR ¶¶ 33-36. Mr. Miralda-Cruz's lack of criminal history and youth are evidence that his negative traits are "less fixed" than that of an older adult. *See Miller*, 567 U.S. at 471. He has ample time, opportunity, and motivation to change his path in life. In fact, he has stated that he plans to "change a lot" and "do things the right way" upon his eventual release from custody. PSR ¶ 56. A 48-month sentence would account for Mr. Miralda-Cruz's youth, lack of criminal history, and motivation to change his life.

**III. A four-year custodial term, especially given the collateral consequences Mr. Miralda-Cruz faces, reflects the seriousness of the offense, protects the community, and provides deterrence**

The parties' recommendation represents a significant sanction for anyone, let alone an eighteen-year-old: four years in custody, followed by near-certain deportation. In determining an appropriate sentence, a district court can consider the impact of deportation on a defendant. *See, e.g., United States v. Thavaraja*, 740 F.3d 253, 263 (2d Cir. 2014) ("[A] district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family."). After spending his formative years as a

young adult in custody in the United States, Mr. Miralda-Cruz may spend additional time in immigration detention, possibly in other countries or in dehumanizing conditions, before he is ultimately deported. Further, with this criminal conviction on his record, Mr. Miralda-Cruz will be virtually foreclosed from all avenues for seeking legal status in the United States. This collateral consequence, for a teenager who hoped to study English and continue his education in the United States, is immense. Together, a 48-month sentence and its collateral consequences reflect the seriousness of Mr. Miralda-Cruz's offense and provide general deterrence. *See* 18 U.S.C. § 3553(a)(2)(A)-(B).

      The proposed sentence also addresses the need to protect the public and to afford specific deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). Following his time in custody, Mr. Miralda-Cruz will not be present in the United States to reoffend. Were he to return to the United States, he would face a higher statutory maximum for illegal reentry and additional custodial time on a supervised release violation. *See* 8 U.S.C. §1326(b)(2) (increased statutory maximum for illegal reentry following an aggravated felony conviction).

      In any event, Mr. Miralda-Cruz has no intention of returning to the country and reoffending. Though his childhood was challenging, he enjoys a supportive relationship with his parents, with whom he will be reunited when he returns to Honduras. PSR ¶ 42. He also has plans for employment upon his return: He will work on his family's farm and sell produce at his grandfather's fruit stand. *Id.* ¶ 56. He looks forward to "contributing to the family business." *Id.* A 48-month sentence therefore provides just punishment, protects the public, and affords adequate deterrence to any future criminal conduct.

## CONCLUSION

The parties' request is for a substantial custodial term, followed by a significant collateral consequence. It accounts for the seriousness of the offense, while also acknowledging Mr. Miralda-Cruz's youth, the poverty and violence he experienced as a child, and his lack of criminal history. Mr. Miralda-Cruz recognizes that his offense hurt the community, and he is ready to accept the consequences of his actions. A 48-month sentence reflects the severity of his conduct, but it also gives him, as a young man, the opportunity to change his path going forward.

Dated: August 8, 2025                    Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

_____/S_____
JOHN PAUL REICHMUTH
Assistant Federal Public Defender

_____/S_____
ANAIS CARELL
Fellowship Assistant Federal Public Defender

SENTENCING MEMORANDUM
*MIRALDA-CRUZ*, CR 24–593 JST

7