CRAIG H. MISSAKIAN (CABN 125202)
Acting United States Attorney

MARTHA A. BOERSCH (CABN 126569)
Chief, Criminal Division

DANIEL N. KASSABIAN (CABN 215249)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7034
    Fax: (415) 436-7234
    daniel.kassabian@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>ELDIN JAHIR MIRALDA-CRUZ,<br><br>    Defendant. | Case No.   CR 24-00593-JST<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date:  August 15, 2025<br>Time:  9:30 a.m.<br>Ctrm:  6, 2nd Floor<br>Judge: The Honorable Jon S. Tigar |

I.     SYNOPSIS

Defendant Eldin Jahir Miralda-Cruz comes before this Court for his sentencing, having pleaded guilty to Conspiracy to Distribute and to Possess with Intent to Distribute Fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C), as set forth in Count 1 of the Information [ECF 16]. The charges reflect what this young man has done before he was arrested: sold deadly fentanyl to members of our community in the San Francisco Bay Area, while coordinating with his co-conspirators in Portland, Oregon, to manufacture and sell fentanyl there as well.

Mr. Miralda-Cruz youthful looks bely his true nature. He fed fentanyl to those living in despair, drawn to a drug they know is likely to kill them. And yet, Mr. Miralda-Cruz—either personally or through his co-conspirators in Portland—delivered them that poison. He did so prolifically, as evident from a wiretap of his two cell phones. And, when his co-conspirators in Portland were arrested, he did not heed that obvious warning to stop. The defense will undoubtedly highlight other aspects of Mr. Miralda-Cruz, such as the difficulties he faced growing up in Honduras. But how that experience, even if true, provides justification for the harm he propagated on others is unclear—it seems to be a pure play for sympathy. That said, the government recognizes that Mr. Miralda-Cruz's youth, including that he just turned 18 years old when arrested, warrant consideration. While this wasn't a single act of youthful indiscretion or momentary lack of judgment, his lack of maturity likely had some role in his failure to appreciate the gravity of his harm to society.

Accordingly and per the parties' Plea Agreement [ECF 25], the government joins the defense in seeking a 4-year sentence of imprisonment, a downward variance from the 70-87 months pursuant to the Sentencing Guidelines. This sentence reflects the gravity of Mr. Miralda-Cruz and reflects the significant reduction because of his age at the time of his offense conduct. This sentence is necessary to deter others like this defendant, who are uniquely adept and industrious at selling deadly fentanyl in mass amounts that undoubtedly brings death to our community. This imprisonment term is sufficient but no greater than necessary to meet the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

II.     THE DEFENDANT'S DRUG TRAFFICKING BEFORE THE OFFENSE CONDUCT

Investigation by the U.S. Drug Enforcement Administration (DEA) indicates that Mr. Miralda-Cruz was dealing fentanyl in the San Francisco Bay Area since at least August 2023, when he was 16

years-old. Yet to be unidentified, Mr. Miralda-Cruz sold fentanyl to a DEA undercover agent (UC) back then. In the months that followed, the DEA identified him and other drug dealers with whom he was working. The investigation included an order authorizing the wiretap of Mr. Miralda-Cruz's cellular telephone (target telephone 1 or "TT1") from July 25 to August 23, 2024, in order to ascertain his sources and the extent to which, given his youth, he was being pressured or influenced into drug trafficking. But, what the DEA found instead was that Mr. Miralda-Cruz had a significant customer base of fentanyl buyers in Portland, and was working with co-conspirators there to fulfill orders that those customers placed with him. But the investigation remained incomplete: the full extent of his relationship with those co-conspirators was yet to be determined, especially because of the discovery of a second cellular telephone (target telephone 2 or "TT2") used by Mr. Miralda-Cruz simultaneously to contact them, which was not wiretapped at that time.

### III. OFFENSE CONDUCT

The DEA obtained another order authorizing the wiretap of Mr. Miralda-Cruz's TT1 and TT2 for 30 days, starting on October 15, 2025, by which time Mr. Miralda-Cruz was 18 years old. As described in further detail below, those calls demonstrated that Mr. Miralda-Cruz was no pawn, but instead directed co-conspirators who were older than him, including one who went by the name "Tito," to sell fentanyl in Portland, while Mr. Miralda-Cruz continued to sell fentanyl in the San Francisco Bay Area. During the wiretap period, monitoring occurred daily from approximately 9:00 a.m. to approximately 1:00 a.m.—the need to monitor calls into the early morning hour was dictated by Mr. Miralda-Cruz's trafficking patterns. The following table summarizes the communications intercepted on TT1 and TT2 during the interception period, with "pertinent" communications reflecting the DEA monitoring agents' belief that the communications reflected drug trafficking activity:

|  | TT1 | TT2 |
|---|---|---|
| Total Number of Phone Calls | 608 | 174 |
| Pertinent Calls | 280 | 81 |
| Total Number of Text Messages | 1049 | 159 |
| Pertinent Text Messages | 371 | 6 |

**A.    The Defendant Sells Fentanyl With Co-Conspirators In Portland (Count 1)**

As set forth in the parties' Plea Agreement and with some additional details noted herein, from October 15, 2024, to Tito's arrest on October 29, 2024, Mr. Miralda-Cruz resided in Oakland, from

1  where he directed Tito and others in Portland to possess, prepare, and distribute fentanyl to purchasers in
2  Portland and elsewhere on Mr. Miralda-Cruz's behalf with telephone calls and text messages using TT1
3  and TT2.  As part of that conspiracy, on the day Tito was arrested in Portland on October 29, 2024, Tito
4  possessed for distribution, on Mr. Miralda-Cruz's behalf, over 3 kilograms of fentanyl along with
5  cutting agents and mixing tools to increase the amount of substance containing fentanyl for distribution.
6      Wiretapped calls to and from Mr. Miralda-Cruz's TT1 and TT2 during that period of time
7  revealed that Mr. Miralda-Cruz directed Tito to prepare the substances containing fentanyl for
8  distribution, including by mixing the fentanyl with cutting agents in certain proportions to increase the
9  volume of the substance containing fentanyl for distribution to others while maintaining sufficient
10 potency.  In these communications, Mr. Miralda-Cruz and Tito also discussed that one of their fentanyl
11 sources was the Cartel Jalisco New Generation (CJNG), which is a cartel that is a major distributor of
12 fentanyl and other controlled substances from Mexico into the western United States.
13     Wiretapped calls to and from Mr. Miralda-Cruz's TT1 and TT2 during that time also revealed
14 that he communicated with fentanyl purchasers in Portland to distribute to those purchasers the
15 substances containing fentanyl as prepared by Tito.  Those arrangements included discussing with those
16 purchasers the amount of fentanyl, the price, and where the distribution was to take place.  As one
17 example of many, on October 18, 2024 at 1:42 a.m., agents intercepted a text message conversation
18 between Mr. Miralda-Cruz using TT1 and the user of x7773 ("UM-7773") [call # 24747, 24750, 24760].
19 Per a preliminary transcript of an excerpt of that conversation:
20     *MIRALDA:*    *You have 150 you say*
21     *UM-7773:*    *Yes*
22     *MIRALDA:*    *Damn. Bro I give you 8 g and you owe 150*
23 Based on their training and experience, DEA agents believe Mr. Miralda-Cruz gave UM-7773 eight
24 grams' worth of drugs and UM-7773 still owed MIRALDA $150, possibly from a previous drug deal
25 between them.  And later that day, at approximately 9:54 p.m., Mr. Miralda-Cruz and UM-7773
26 continued their text message conversation [call # 24816, 24821, 24838], per the following preliminary
27 transcript of an excerpt of their conversation:
28     *UM-7773:*    *Hey can you send Addy I'm in route*

U.S.' SENTENCING MEMO.            3
Case No. CR 24-00593-JST

| | | |
|---|---|---|
| MIRALDA: | 215 NE Laddington Ct, Portland, OR 97232 |
| UM-7773: | Hey I'm here bro can you help me with that whole one now I am going straight to Gresham and straight back my homegirl up there has 1500 for a full one |

Based on their training and experience, DEA agents believe UM-7773 requested to purchase an ounce of drugs from Mr. Miralda-Cruz ("Hey I'm here bro can you help me with that whole one now…"). Agents believe UM-7773 was going to pay MIRALDA approximately $1,500 for one ounce of drugs, reflecting high quality, uncut fentanyl ("…my homegirl up there has 1500 for a full one.").

At the same time of those communications, Mr. Miralda-Cruz also communicated with Tito to direct Tito to distribute the fentanyl to those same purchasers in Portland. Those directions included detailing the amounts of fentanyl to be distributed to the purchasers, the price they should pay for the fentanyl, and when and where the distributions were to take place. As one example of many, on October 21, 2024, at 10:19 p.m., DEA agents intercepted an outgoing call from Mr. Miralda-Cruz using TT1 to Tito [call # 25328]. The following is a Spanish to English translation of a preliminary summary of an excerpt of their conversation:

> MIRALDA-CRUZ said the Kia guy (UM-4503) was there. TITO asked what he (UM-4503) wanted. MIRALDA-CRUZ said he (UM-4503) had 2,680 and told TITO to give him (UM-4503) 2 and 1/2 ounces and an 1/8, because he (UM-4503) was going to pay 80. MIRALDA-CRUZ told TITO that for 100, to just give him (UM-4503) 2 grams. TITO told MIRALDA-CRUZ to tell him (UM-4503) that it was not a problem, but that he (MIRALDA-CRUZ) could not keep giving it to him (UM-4503) on credit. MIRALDA-CRUZ said for sure.

Based on their training and experience, DEA agents believe Mr. Miralda-Cruz had a customer (UM-4503) waiting to purchase drugs from Tito through Mr. Miralda-Cruz. Based on previous conversations, agents believe Tito inquired about what UM-4503 wanted to purchase, and Mr. Miralda-Cruz explained to Tito that UM-4503 had $2,680. Agents believe Mr. Miralda-Cruz told Tito to sell UM-4503 2½ ounces worth of drugs and an additional 1/8 ounce. Agents believe UM-4503 was going to pay an additional $80 for the 1/8 ounce of drugs. Agents believe Mr. Miralda-Cruz also told Tito to sell UM-4503 an additional 2 grams of drugs in exchange for $100.

Tito and others were arrested on October 29, 2024, and they are currently charged with possession of fentanyl for distribution in the District of Oregon, case no. 3:24-cr-00413-IM, with the matter currently set for trial on October 14, 2025. Of note, Mr. Miralda-Cruz was not also arrested on

1  October 29, 2024 in the San Francisco Bay area. Instead, his wiretapped calls reveal that he learned of
2  Tito's arrest, but continued to communicate with clients in Portland to maintain relationships in the
3  hopes of Tito's quick release from custody to return to distributing on Mr. Miralda-Cruz's behalf.

**B.     The Defendant Sells Fentanyl In The Bay Area (Related Conduct)**

As charged in Count 2 of the Information, on October 23, 2025 at approximately 5:30 p.m., Mr. Miralda-Cruz left his home in Oakland and met a UC per a text message exchange earlier that day. At that meeting Mr. Miralda-Cruz sold 23.5 gross grams of fentanyl to the UC in exchange for $240.

In addition, DEA agents believe they intercepted several calls where Mr. Miralda-Cruz made arrangements to sell fentanyl in the San Francisco Bay Area on several days. For example, on October 25, 2024 at 6:12 p.m., agents intercepted an incoming call to Mr. Miralda-Cruz using TT1 from UM-7470 [call # 25645]. The following is a Spanish to English translation of a preliminary summary of an excerpt of their conversation:

> *Parties greeted. UM-7470 said that one (possibly narcotics) did not pass, it was too soft, too low. MIRALDA-CRUZ said oh really. UM-7470 said they told him (UM-7470) it (possibly narcotics) was too low. MIRALDA-CRUZ said he (MIRALDA-CRUZ) was not sure what happened, UM-7470 could [U/I] those (possibly narcotics) if UM-7470 wanted to. UM-7470 said yesterday a client tried it (possibly narcotics) and said it was too low and did not take shit. MIRALDA-CRUZ said that was weird because there was a guy (third party) that would also complain to MIRALDA-CRUZ that way. UM-7470 said oh. UM-7470 said they (customers) told UM-7470 it was good but too low, not like the other new ones (possibly narcotics). MIRALDA-CRUZ asked if UM-7470 wanted to meet up later to return it (possibly narcotics) and MIRALDA-CRUZ would give UM-7470 some bucks. UM-7470 said alright, around what time. MIRALDA-CRUZ said [U/I], like at 8 (p.m.). UM-7470 asked if they would see each other there (possibly 88th Ave and Olive Street, Oakland per call # 25510). MIRALDA-CRUZ said [U/I] like at 8:00 [U/I]. UM-7470 said alright. UM-7470 asked if they (UM-7470 and MIRALDA-CRUZ) would see each other there [U/I]. MIRALDA-CRUZ said yes. UM-7470 asked if MIRALDA-CRUZ could earlier, like 7:30 (p.m.). MIRALDA-CRUZ said no. UM-7470 said alright, then at 8:00. MIRALDA-CRUZ said alright.*

Based on their training and experience, DEA agents believe UM-7470 had his (UM-7378's) drug customers ingest/test the drugs sold to UM-7470 by Mr. Miralda-Cruz and the customers complained about the quality of the drugs. Agents believe Mr. Miralda-Cruz explained to UM-7470 that Mr. Miralda-Cruz had a similar situation in which Mr. Miralda-Cruz's customers also complained about the quality of the drugs. Agents believe Mr. Miralda-Cruz then offered for UM-7378 to return the drugs for a partial refund. Agents believe UM-7470 agreed to meet with Mr. Miralda-Cruz to reconcile the drug

transaction. Based on previous conversations between UM-7470 and Mr. Miralda-Cruz, agents believe both parties agreed to meet near 88th Avenue and Olive Street in Oakland. Agents also believe the meeting was going to take place at approximately 8:00 p.m. on the night of October 25, 2024.

### IV. THE DEFENDANT'S CRIMES ARE SERIOUS, AND THE COMMUNITY NEEDS PROTECTION BY DETERING PROLIFIC DRUG DEALERS LIKE HIM

His wiretapped calls reveal that Mr. Miralda-Cruz's conduct was driven by the simple need for pecuniary gain—there was no coercion or undue influence of this industrious young man who would often be making calls in furtherance of fentanyl distribution into the late hours of the evening and early hours of the next day. But at what cost to society? The effect of his conduct—the fentanyl addicts often found on the streets of urban areas, like San Francisco and Portland—is inescapable to even the most casual observer. These human beings are derided as "zombies" because their addictions have robbed them of their free will—and those are the survivors.

In this instance, Mr. Miralda-Cruz was not only comfortable making a living from this crisis in the San Francisco Bay Area and Portland, he was highly productive at it—a kilo-level dealer per his monitored communications and as corroborated by the 3-kilo seizure of fentanyl in Portland. To be sure, Mr. Miralda-Cruz is not solely responsible for this broader societal problem. But he acted with indifference to his own role that is necessarily in furtherance of it, and undeterred by his coconspirator's jailing. His conduct must be viewed in context. Author and journalist Sam Quinones, aptly analogized selling fentanyl as "shooting into a crowd" given the foreseeable and potentially lethal impact, when he presented to the local Federal Bar Association on June 12, 2023, at a program called *The Fentanyl Public Health Crisis: A Conversation with Journalist and Author Sam Quinones* moderated by the Honorable Trina L. Thompson, United States District Judge. *See* https://www.fedbar.org/event/northern-district-of-california-chapter-the-fentanyl-public-health-crisis-a-conversation-with-journalist-and-author-sam-quinones/. Mr. Quinones's knowledge about the impacts of drug trafficking and use goes back to when he started journalism in the late 1980s and lived for 10 years in Mexico, where he saw the drug trade there firsthand. *See* https://samquinones.com/.

### V. SENTENCING GUIDELINES CALCULATION

The government agrees with the Guidelines offense level calculation in the Pre-Sentence

Investigation Report (PSR) [ECF 28] for Mr. Miralda-Cruz with a Total Offense Level of 27. *See* PSR ¶ 31. Because he is a Criminal History Category (CHC) of I, *see id* ¶ 35, the Guidelines range for Mr. Miralda-Cruz is 70-87 months of imprisonment, *see id* ¶ 61. The parties have entered into a Plea Agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C) jointly seeking a sentence of 48 months of imprisonment 3 years supervised release, no fine, $100 special assessment. *See* Plea Agmt. ¶ 7. The PSR also recommends that term of imprisonment. *See* PSR, Sentencing Recommendation, at 1.

## VI.   SENTENCING RECOMMENDATION

### A.   Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

- the nature and circumstances of the offense and the history and characteristics of the defendant;
- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- the need for the sentence imposed to afford adequate deterrence to criminal conduct; and
- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B.   The Defendant's Instant Offenses And Related Criminal Conduct Call For A Sentence That Will Protect The Community And Actually Deter Him

The evidence summarized above shows that Mr. Miralda-Cruz did much more than the one controlled-buy to a UC with which he was charged in Count 2. Instead, per Count 1 to which he pled guilty, including his intercepted telephone calls during two separate time periods, he spent more than a year leading up to his arrest selling fentanyl in the San Francisco Bay Area and Portland such that, by the time he was 18 years old, he was selling fentanyl daily and directing others in furtherance of his selling, and that he excelled at it given his dedication. His diligence at his age would be commendable,

but for the fact that he sold deadly poison, which makes it abhorrent.

The nature and circumstances of his charged offense, and the need to impose a sentence that reflects the seriousness of that offense, if standing alone, would make a guidelines sentence appropriate. Just as paramount is the need to deter others, like Mr. Miralda-Cruz, and punish them, for becoming prolific drug dealers that harm this society to make money. But a countervailing consideration is Mr. Miralda-Cruz's age. The vitality of his youth that comes with it is accompanied by a lack of maturity to fully appreciate the harm he is causing.

Finally, protecting the public should be the Court's primary objective in sentencing this successful drug dealer. Moreover, like any other unlawful employment driven purely by economic gain, the behavior of a drug dealers is motivated by a simple cost-benefit analysis. Mr. Miralda-Cruz's sentence should serve as a deterrent for fentanyl dealers who are so prolific that they are significantly contributing to the drug crisis in the San Francisco Bay Area and elsewhere in this nation. Like any other unlawful employment driven purely by economic gain, the behavior of a drug dealer, like Mr. Miralda-Cruz, is motivated by a simple cost-benefit analysis. This is not youthful indiscretion before the Court, but instead the result of a cold calculus to get himself ahead by praying on the weak and vulnerable persons addicted to fentanyl in this community. A sentence of 48 months shifts that calculus and sends a message that Mr. Miralda-Cruz, and other drug dealers like him, are better off continuing to seek gainful employment then slipping into the easy money that comes from selling poison in the San Francisco Bay Area, Portland, and elsewhere. And, while their youth will be a consideration, it will not be tantamount to a get-of-jail free card that absolves them of responsibility for their actions.

**VII.   CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence Mr. Miralda-Cruz to 48 months of imprisonment, three years supervised release, and a $100 special assessment.

DATED:  August 8, 2025                               Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
DANIEL N. KASSABIAN
Assistant United States Attorney